EDOK - Application for Search Warrant (Revised 5/13)

# United States District Court

## EASTERN DISTRICT OF OKLAHOMA

FILED

DEC 09 2019

PATRICK KEANEY
Clerk, U.S. District Court

By_____
Deputy Clerk

In the Matter of the Search of the premises located at 15030 East 253rd Street South, Webbers Falls, Oklahoma 74470

Case No.

**MJ - 19 - 108 - KEW**

## APPLICATION FOR SEARCH WARRANT

I, Timothy James Deppner, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the **EASTERN** District of **OKLAHOMA** *(identify the person or describe property to be searched and give its location)*:

### SEE ATTACHMENT "A"

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18, United States Code, Section 1343, Title 18, United States Code, Section 1956, Title 18 United States Code, Section 1957 and Title 18, United States Code, Section 371, and the application is based on these facts:

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
TIMOTHY JAMES DEPPNER
SPECIAL AGENT, FBI

Sworn to before me and signed in my presence.

Date:  12/9/2019

_____
*Judge's signature*
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and state:  __Muskogee, Oklahoma__

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 15030 EAST 253rd STREET SOUTH, WEBBERS FALLS, OKLAHOMA 74470 | Case No. **Filed Under Seal** |

## AFFIDAVIT

I, Timothy James Deppner, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Special Agent with the FBI since September 2015. Since that time I have conducted criminal investigations in a variety of matters to include fraud and financial crimes, Indian Country matters, crimes against children, as well as other federal criminal matters. I am currently assigned to the Oklahoma City Division of the FBI, Muskogee Resident Agency. The Muskogee Residence Agency is located in the Eastern District of Oklahoma. Prior to being an FBI Special Agent, I was a police officer in Springdale, Arkansas, for approximately three years and three months, responsible for the enforcement of a variety of criminal laws. Through training and experience, I am familiar with and experienced in the execution of search warrants associated with criminal investigations.

2.      I make this affidavit in support of an application for a search warrant for the residence of DAVID WAYNE BENEFIELD located at 15030 East 23rd Street South, Webbers Falls, Oklahoma, 74470 (hereinafter the "**TARGET RESIDENCE**") -- a one-story modular home with a brown roof, white front door, and two white single car garage doors and is further described in Attachment A -- and to search and seize any items identified in Attachment B.

1

Attachment A and Attachment B are hereby incorporated fully by reference herein. I also respectfully request to be permitted to seize all electronic devices, as described in Attachment B that may be located on the premises and further access and search the contents of said electronic devices without seeking an additional or separate warrant. The purpose of this warrant is to search for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 – Wire Fraud, 18 U.S.C. § 1956 – Laundering of Monetary Instruments, 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, and 18 U.S.C. § 371 – Conspiracy to commit Wire Fraud and Money Laundering (hereinafter the "**SUBJECT OFFENSES**").

3.      The information set forth below is based upon my knowledge of the investigation conducted by the FBI. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, various documents, database records, and other information. I have not included each and every fact obtained pursuant to this investigation, and instead have only included facts sufficient to establish probable cause for the requested search warrant to issue.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations, the **SUBJECT OFFENSES** have been committed, are being committed, and will be committed by FORREST NICHOLAS WRIGHT (hereinafter "FORREST"), AMANDA DIANE WRIGHT (hereinafter "AMANDA"), and DAVID WAYNE BENEFIELD (hereinafter "BENEFIELD"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

2

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because the **TARGET RESIDENCE** is located in the Eastern District of Oklahoma.  Fed. R. Crim. P. 41(b)(1).

## DEFINITIONS AND TERMINOLOGY

6.      Due to the industry specific nature of the allegations contained in this affidavit, it is important to understand the terminology and provide definitions of relevant terms, both industry specific and general financial terms that may be used below.

        a.  100% Pad – An 8-10 acre materials staging area for exploration operations.  This ConocoPhillips Company property is located in Deadhorse, Alaska.

        b.  Actian – Is a third party e-invoicing company contracted with ConocoPhillips Company to intake invoices and supporting documents electronically from ConocoPhillips Company vendors.  Vendors sign up for an account with Actian, and have to login to Actian using the internet to be able to submit invoices and supporting documentation for payment.

        c.  Alaska Railroad Yard – A storage and materials transfer facility located in Fairbanks where oil companies stage equipment to be moved northward for drilling operations.  The Alaska Railroad Corporation is a public corporation authorized to own and operate the Alaska Railroad.

        d.  Alpine – A North Slope drilling location on the Colville Delta.  The only way to get there is over the ice-road or by airplane.

        e.  ASRC Energy Services (AES) – Is a subsidiary of Arctic Slope Regional Corporation, that provides contracting work to ConocoPhillips Company.

3

f.   Bill of Lading (BOL) – A detailed list of materials shipped or delivered. This is in the form of a receipt.  With respect to ConocoPhillips Company, the acquisition of the Bill of Lading was the third step in the material acquisition process.

g.   Casing – A hollow steel pipe used to line the inside of a drilled hole and provides protection for groundwater and aquifers during an oil drilling operation.

h.   ConocoPhillips Company (COP) – Oil company headquartered in Houston, Texas, with financial matters handled in Bartlesville, Oklahoma.

i.   ConocoPhillips Company-Alaska (COPA) – ConocoPhillips Company branch operating in Alaska.

j.   Electronic Funds Transfer (EFT) – Synonymous with ePayments, EFT is a broad term that includes many types of electronic payments such as Automated Clearing House (ACH) transfers, wire transfers, direct deposits, eChecks, personal computer banking, among others.   In short, an EFT is an electronic transfer of money from one bank account to another.

k.   Extended Reach Drilling (ERD) – Directional drilling of long horizontal wells for the purpose of reaching a larger area from one surface drilling location, and to maximize its productivity while maintaining a small surface footprint.

l.   Freight on Board (FOB) – A term often used when discussing the shipment of materials both domestically and internationally.

4

m. Goods Receipt – Generated in ConocoPhillips Company's SAP system once someone has physically verified that the ordered material has arrived at its intended location. The goods receipt is the fourth step in the material acquisition process.

n. Health, Safety and Environment (HSE) – Refers to a branch of a company that is responsible for the observance and protection of occupational health and safety rules and environmental protection.

o. Invoice – With respect to ConocoPhillips Company the invoicing is the fifth and final step before payment occurs in the material acquisition process. Once the goods receipt is generated in the SAP system, the vendor becomes authorized to submit an invoice to ConocoPhillips Company for payment. The invoice is a detailed list of goods sent or services provided, with a total sum due.

p. Joint – A single piece of straight pipe.

q. Kuparuk – Located on the North Slope near Prudhoe Bay, Kuparuk is North America's second largest oil field.

r. Oil Country Tubular Goods (OCTG) – Is a family of seamless rolled products consisting of drill pipe, casing and tubing.

s. Purchase Order (PO) – With respect to ConocoPhillips Company, the purchase order is the second step in the material acquisition process. It acts as a contract to order the material, and also includes a delivery point, a cost object, expected delivery time, instructions on how to invoice, and payment terms.

5

t. Requisition – With respect to ConocoPhillips Company, a requisition is an order. It is the first step in the material acquisition process. The requisition explains what is needed, the quantity, price, and the vendor designated to provide the materials. ConocoPhillips Company has allowed some requisitioners to act as approvers of the requisition up to specific dollar amounts, for efficiency. The approval amount varies between employees.

u. SAP System – ConocoPhillips Company's internal time management and financial records recording system.

v. Tubing – A length of pipe assembled to provide a conduit through which oil and/or gas will be produced from a wellbore.

## GENERAL SCHEME

7.     FORREST and his wife AMANDA are at the center of a large and active fraud scheme involving COPA, and two COPA vendors: DB Oilfield Support Services (hereinafter "DB Oilfield") and Eco Edge Armoring, LLC (hereinafter "Eco Edge"). BENEFIELD is the owner of DB Oilfield. BENEFIELD is AMANDA's father, and FORREST's father-in-law. The owner of Eco Edge is NATHAN KEAYS, an active duty Anchorage K-9 Police Officer. Open source record searches revealed that it is highly likely that FORREST and KEAYS graduated from West Valley High School in Fairbanks, Alaska in 1998. Additionally, AMANDA and KEAYS's wife, Kelly Keays seemed to have attended North Pole High School together. FORREST is a materials procurement employee at COPA, whose duties include requisitioning material and labor for COPA's Drilling and Wells program.

6

8.     Since approximately April 2019, FORREST advocated and received vendor approval through his chain-of-command for both DB Oilfield and Eco Edge to provide material and labor to COPA. Once DB Oilfield was approved as a vendor, FORREST, in conjunction with BENEFIELD and AMANDA, conspired to submit false invoices and supporting documentation through Actian to COPA for material that did not exist, has never existed, and in most cases are impossible or impracticable to use in Alaska.

9.     Likewise, once Eco Edge was approved as a vendor, FORREST, in conjunction with KEAYS and possibly AMANDA, conspired to submit false invoices and supporting documentation through Actian to COPA for material that did not exist, has never existed, and in most cases are impossible or impracticable to use in Alaska. Moreover, FORREST, KEAYS and possibly AMANDA conspired to submit false invoices through Actian to COPA for labor charges allegedly performed at various COPA locations across Alaska to include Alpine, 100% Pad, Kuparuk and the Alaska Railroad Yard in Fairbanks, Alaska. When in reality, Eco Edge did not do work at any of the aforementioned locations.

10.     The cumulative loss to COPA for monies paid via EFT to DB Oilfield and Eco Edge is $7,125,270. Of that amount, $4,148,000 was paid to DB Oilfield and $3,027,270 was paid to Eco Edge. Moreover, KEAYS is actively attempting to collect an additional $62,250 for labor and $98,430 for material. The labor was never performed, and the materials do not exist.

11.     Based on a preliminary review of bank statements, it is suspected that approximately half of all the monies sent from COPA to Eco Edge is transferred to Spectrum Consulting Services, a company owned by FORREST and was set up with the State of Alaska on April 5, 2019. Additionally, FORREST and AMANDA co-own another company with a similar

7

name, Spectrum Consulting, which was also set up with the State of Alaska, but one day earlier on April 4, 2019.

12.     The 50 percent "kickback" to FORREST and AMANDA is likely for the benefit of KEAYS acquiring access as a vendor to COPA through FORREST. The bank statements also suggest that BENEFIELD has kicked back approximately 90 percent of all the monies COPA paid DB Oilfield. The money sent from DB Oilfield also went to Spectrum Consulting Services' bank account.

13.     Through the summer of 2019, FORREST and AMANDA purchased 17 houses in Las Vegas, Nevada. The purchases were drawn on the Spectrum Consulting Services account, but the ownership of the houses were under Wright Capital Investments, LLC, a company set up in Nevada on July 23, 2019 by FORREST and AMANDA.

14.     FORREST and AMANDA hired Orange Realty Group in Las Vegas, Nevada to manage the aforementioned properties purchased with money received from COPA.

## **PROBABLE CAUSE**

### *DB OILFIELD SUPPORT SERVICES*

15.     BENEFIELD is AMANDA'S father and FORREST's father-in-law.

16.     BENEFIELD is the sole owner of DB Oilfield.

17.     BENEFIELD organized DB Oilfield in Alaska on April 23, 2019, but is domiciled in Oklahoma at the **TARGET RESIDENCE**.   Both the physical and mailing address for DB Oilfield is the **TARGET RESIDENCE**.   DB Oilfield's North American Industry Classification System (NAICS) code since inception with the State of Alaska Department of Commerce Community and Economic Development, was 521990 – All Other Professional, Scientific, and Technical Services. The NAICS Code is the standard used by Federal statistical agencies in

8

classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the American economy.

18.     On April 26, 2019, FORREST worked with BENEFIELD through COPA employee George Wilcox to get DB Oilfield set up as a vendor for COPA. This included Wilcox sending BENEFIELD a blank W9 and Electronic Funds Transfer enrollment form.

## *PIPE RACK SYSTEMS*

19.     Even before DB Oilfield became a vendor on the books for COPA and the same day DB Oilfield was organized in Alaska, FORREST attempted to lay the groundwork for COPA to purchase pipe rack systems with Shon Robinson, Manager Drilling and Wells and James Meyer, Supervisor Alaska Growth Business. The initial e-mail sent by FORREST to both Robinson and Meyer was lengthy, but necessary to understand in its totality:

> My apologies for coming directly to you, as you know I don't normally do this however this effects all of D&W and feel you're the only person that can give the okay to my proposal.
>
> The issue is this:
>
> We barely made it across the ice road this year with all our equipment ordered (SC and I are working with the RR & trucking companies to help for a better crossing next year). As you know with the ERD rig coming to Alpine this next year in addition to our normal resupply and of course all the other operators OCTG coming in at the same time it is becoming more difficult for us (COP) to manage our OCTG in Fairbanks as it arrives off the Rail Road. We recently hired a company in Fairbanks to help us keep track of our OCTG while at the same time ensuring that we get our 2% discount from Tenaris (it is working, we are coming out ahead $4-500K/yr now which I am excited to report, this is even after paying the company to help us manage the pipe). Erica made sure I captured the savings.
>
> With all our casing and tubing arriving via RR into Fairbanks for not only D25 & D-26 there is also pipe arriving for Exploration, Kuparuk, Work-overs, CTD and of course as mentioned all the other operators. It was suggested that we could easily keep track of our OCTG if we had some specialized racks built to directly offload from the rail car to the

these racks which would perfectly accommodate each trucks load as well (saving on time and more/most importantly HSE risk) I'm sure you are aware of the fatality there a few years ago, there is a concern that with (especially the larger pipe we are getting that not only inspecting it will be a challenge (-30deg weather etc) but so will transporting it. To help avoid any mishaps I had a few contractors investigate alternatives for a safer, but also more efficient way of handling our OCTG. I received a few quotes back therefore before proceeding wanted to see if I could get your blessing on getting these racks/inspection station built.

The reason I'm asking you directly is because I feel it would be wrong to order these against the warehouse, I believe Op's will have a hard time accepting this. <u>I'd propose (since every group in D&W) will be using these racks we spread the cost over every open AFE that we currently have that way no one well or 'group' will get hit with the price tag (could be 10-15 open AFE's so no heavy impact on any one project.</u> I believe this is the right way to approach this, my hesitation is that I do not want to upset any one particular group that works for you... May I proceed having these built and split the charges, it's a Requisition/PO nightmare with that many charge codes, but these will last for many years and truly benefit us for a safer and more efficient operation. If we proceed with this, I will make it absolutely 100% clear to the RR that these racks are to be used for COP only (they will be well marked, painted and welded COP).

I cc'd Mr. James Meyer in case he has any suggestions for charging it out as well. Please let me know what you think. Thanks again, Forrest

20.     Shortly thereafter, Meyer responded to FORREST and copied Robinson:

My 2 cents – from an operational standpoint, I can see where there would likely be benefit. **From a financial standpoint – we can't afford to pay for it this year**. If it makes operational sense, we could include it into the budget for next year. If so, we should write an AFE for it and make the racks a standalone asset (not distribute the cost to the individual wells). If we include in the budget, the racks could be ordered this year, **but we need to make sure (very sure) we do not receive or pay for them this year**. (Emphasis Added)

21.     FORREST retorted in an e-mail to Meyer and Robinson:

Thanks James, as always, your two cents are always appreciated! We would need to order now to have them built in time for next years ice road. I would have it written into

the PO that they (the bid winner) is not to invoice until Jan 1st of 2020, I'll even personally follow up to ensure they don't. I feel this is important and could really help keep us out of trouble in next year's unquestionably challenging season (from a pipe management standpoint). Mr. Shon, I've (and SC) received pricing from 4 suppliers. The most being a little over $2M the least $1.2M, my thought is that these are something that it would be tough to screw up (dumb iron) so go with the lowest bid ($1.2M) if you okayed this. Do I have the okay to proceed? As mentioned, we would need to order now to have them built in time for incoming pipe next winter (it starts arriving in Jan, before even the ice road).

22.     Robinson's reply to both FORREST and Meyer was simple and to the point, "That is a pretty expensive rack system. **It doesn't sound like it makes sense to save $400k.** Again work with Erica. If you can get her onside let me know." (Emphasis Added) Robinson's reference to Erica, is Erica Livingtson, Chief Engineer, Drilling and Wells – Alaska.

23.     The concepts to understand from the above e-mail exchanges between FORREST, Meyer and Robinson are: 1) FORREST requested that if the pipe racks were approved, the expense could be spread out over 10 – 15 cost codes; 2) Meyer stated COPA did not have the funding available for the pipe rack system; 3) FORREST promised not to invoice the supplier (DB Oilfield) until January, 1, 2020, which ultimately was an empty promise as DB Oilfield was paid on five separate occasions between June 16, 2019 – September 25, 2019, an amount equal to $4,148,000; 4) FORREST claimed he received four quotes from suppliers regarding the pipe rack system. There is no evidence to support FORREST's claim he acquired quotes; and 5) Robinson believed the pipe rack system was "pretty expensive," and that it did not make sense to purchase them simply to possibly save $400,000 per year in labor expenses. Essentially, Robinson and Meyer killed FORREST's sales pitch of the pipe racks to COPA.

24.     Shortly after FORREST's e-mail exchanges with Meyer and Robinson, he reached out to BENEFIELD, in which BENEFIELD utilized dboilfieldss@gmail.com for all

11

incoming and outgoing e-mails. The below e-mail contradicts the guidance received from his

superiors, that the pipe rack systems are too expensive and not worth purchasing to save

$400,000 per year in labor charges. On April 23, 2019, FORREST sent the following e-mail to

BENEFIELD:

> I was informed by a couple other operators I know down south that you provide pipe
> racking systems specifically for the RR in the lower 48. I'd be very interested in what
> you have to offer for Fairbanks, Alaska. Would you be interested in submitting a quote
> for one in Fairbanks? Sizes and quantities attached.

25.     Your affiant learned from open source Facebook posts that BENEFIELD put his

Fairbanks, Alaska house on the market in or around October 2018. It is your affiant's belief that

the comment about BENEFIELD providing "...pipe racking systems for the RR (Railroad) in the

lower 48," was an attempt to codify in COPA e-mails the fictitious notion that BENEFIELD was

established in the lower-48 as a provider of necessary and beneficial material to the oil and gas

industry, when in reality, the earliest record available put BENEFIELD at the **TARGET**

**RESIDENCE** no sooner than July 2017. Additionally, it is your affiant's belief based on

training and experience, both work and life related, that it would be highly unusual for

FORREST to be "informed by a couple other operators I know down south" that BENEFIELD

provides pipe racking systems for Railroads. Due to their familial relationship, FORREST could

hear this information from BENEFIELD directly.

26.     The same day, BENEFIELD, responded to FORREST with the following e-mail:

> Hello Mr. Wright, Yes what you heard is correct. Our systems provide for safer
> offloading and more efficient transport from railcar to trucks saving time, money and of
> course HSE risk. Attached are our typical systems that range in all sizes. I also attached
> a price sheet per system (size). In order to help get into the market in Alaska I'd offer to
> build these in Fairbanks to save you on shipping costs so what you see on the pricing I

12

will honor.  Note our systems are built for the harshest of environments and are built to last 10 even 20 years.

27.     With respect to the above e-mail reply from BENEFIELD to FORREST, in your affiant's training and experience (both professional and general) it would be unusual for any father-in-law to refer to his son-in-law in a formal manner, such as "Mr. Wright." The purpose of doing so was to create the illusion that FORREST and BENEFIELD were operating in an arms-length manner.

28.     On April 23, 2019, FORREST sent BENEFIELD a clarifying e-mail regarding price.  In it, FORREST understood that the total price would come out to "just under $1.2M." FORREST went on to state the following, "I'm always excited to bring new suppliers into our market.  Would you consider $950K for the whole lot?...Thoughts?"

29.     On November 12, 2019, your affiant interviewed Linda Barnett, a COPA Financial Analyst.  According to Barnett, keeping materials purchases under $1 million was important, due to the fact FORREST had the authority to requisition and approve materials up to $1 million.  Anything above that amount would require someone other than himself to approve the acquisition.

30.     During the evening of April 23, 2019, BENEFIELD responded to FORREST's request to lower the total price to $950,000:

> Mr. Wright, truthfully that would really hurt our margins but in trying to look at the big picture for our company I can make this work.  Would you meet me at $975k?  It would at least help cover my folks airfare lol!  Please let me know what you think, if this ends up being a go I'd like to start this project ASAP, I think we can beat a Jan deadline by a month or two.

31.     As referenced above, on April 26, 2019, FORREST facilitated BENEFIELD's DB Oilfield being accepted as a COPA vendor.

13

32.     There is evidence to suggest BENEFIELD was a superficial owner of DB Oilfield, and the real operator behind the scenes of the company was FORREST himself. For example, starting on April 27, 2019 through at least May 5, 2019, FORREST worked with Peter Broady, owner of The Friendly Geek, an Anchorage based small business whose apparent purpose is to help clients with computer related topics, to include the setting up of websites.

33.     After several scheduling emails about organization charts etc., Broady sent FORREST the following email:

> Forrest, Attached is the PowerPoint we were working on today. Thanks again for choosing to go with me. I checked on www.dboilfieldsupportservices.com and it is available. The domain name will cost only $10-15 per year or so (note that this is subject to change after the first two years). Hosting a basic website will probably only cost $10-20 per month. I can help setup the domain and hosting and build the site in just a few hours, but for your security you'll want the domain and hosting accounts to belong to your father-in-law (or you). So I'm thinking the best way to go about it would be for you to setup the domain and hosting accounts (I'll give recommendations and assist if needed), then give me the login information and I'll build the site and show you how to maintain it, then you can change the password so only you and your father-in-law have access. My concern is that the site be under your control rather than a third party. Let me know what you think about this.

34.     The following day, FORREST responded, in part, to Broady with the following e-mail:

> …Regarding the website www.dboilfieldsupportservices.com I'd like to pursue you setting up the domain for us (if your up for it). I unfortunately don't have the time to get in to the nuts/bolts of it. I trust what-ever you can do. Heck it's will just need to be a basic 1 page website. Are you willing to run with it? If so, I can send you the basics that needs to be on the site…

35.     Based on the above e-mail and the totality of the circumstances, it is your affiant's belief that FORREST requested "a basic 1 page website," because DB Oilfield was not a

14

company in the sense that they provided anything of value to COPA. Rather the website was simply for show, in the event someone from COPA searched the internet for the existence of DB Oilfield.

36.    In the midst of getting DB Oilfield registered as a vendor for COPA and pursuing the website set up through Broady, on May 1, 2019 a business checking account was opened for DB Oilfield at Alaska USA Federal Credit Union with an initial $1,000 cash deposit. The business address associated with DB Oilfield was the **TARGET RESIDENCE.** The account, ending in 5982, would go on to receive $4,148,000 in EFT/ACH deposits from COPA between June 16, 2019 and September 25, 2019.

37.    On May 3, 2019, Broady notified FORREST via e-mail that he:

> …went ahead and registered the domain www.dboilfieldsupportservices.com and purchased hosting on HostGator, a reputable and inexpensive hosting service. The annual fee for the domain is $15 and hosting for business is $16.95 per month. I've started doing prep work for the site, including finding some good oilfield photography and layouts. If you send me the information you want on the website, I can have a first draft for you within a week and we can go from there.

38.    FORREST left it up to Broady to do "prep work for the site, including finding some good oilfield photography and layouts." In your affiant's training and experience, if DB Oilfield was a legitimate oil and gas business, Broady would not have to find "some good oilfield" photographs, as DB Oilfield would likely already possess such photographs depicting their own projects.

39.    Finally, on May 5, 2019, FORREST sent an e-mail to Broady in which he laid out the fact the website was only for show:

> As far as the webpage it TRULY just needs to be very basic. 1 page, no drop downs etc, just a nice oilfield picture with the company name, owner, and basic services offered with contact number. Truly that's it. **More for 'show' than practicality.**

15

Name of business: DB Oilfield Support Services

President: David Benefield

Office: 907-251-1217

Fax: 907-251-1218

"Specializing in custom casing, tubing, and drill pipe racks. Also support structures to compliment racks of any kind". Also providing an array of other products as well. Please feel free to contact myself or my team with any questions.

****Something like this is literally all that's needed. Think you can have a draft version by Sunday? I'd like to have it live Monday (even if not perfect yet). **(Emphasis Added)**

40.     On May 5, 2019, FORREST sent an e-mail to COPA contractor Kurt Kegler,

ASRC Energy Services, in which FORREST asked Kegler to create a requisition for 22

adjustable pipe racks (4 1/2" – 2 3/8") at $45,000 each, for a total of $990,000. FORREST went

on to tell Kegler:

We are just having finished being built by DB Oilfield Support Services Vendor #??? (will send the new number it first thing in the morning. They are expediting the set-up now) These will be left & used at the AK RR in Fairbanks and are FOB RR in Fairbanks so when they are ready sometime next week, they are good to go. I'll be sure they send the invoice. In the header please put "to help support Exploration and Alpine…**DB Oilfield Support Services has the patent on this revolutionary design**. We (D&W) shopped around, and even comparable products were higher priced, by $300,000 plus thousand dollars. These racks are essential for our busiest ice road season in 20 plus years. Please see attached summary, justification and quote for $45K each $990/Total FOB Fairbanks RR . (Emphasis Added)

41.     FORREST requested Kegler distribute the cost of the pipe racks across ten

different wells, meaning the total cost of $990,000 would not be borne by one specific well (or

one specific charge code). This, in your affiant's belief, was a way to minimize the red flags by

having several wells with their own specific cost codes incur a small expense, rather than one

well incur the complete cost. If one well sustained the entire charge, it would increase the

chances of someone noticing, and complaining about the expenditure.

16

42.     On the same day, FORREST sent the same duplicative e-mail request for 22 adjustable pipe racks (4 1/2" – 2 3/8") at $45,000 each, for a total of $990,000, to Charles Chapman, COPA contractor working for Airswift, a COPA contractor.   Again, as with Kegler, FORREST requested that Chapman break the total cost across nine (9) different cost codes. FORREST placed the responsibility for the distribution of the costs on "management": "…no biggy management just wants them spread out as best possible." And like the first e-mail, FORREST made it a point to tell Chapman, **"DB Oilfield Support Services has the patent on this revolutionary design."**

43.     Attached to both e-mails to Kegler and Chapman, was a word document promoting the pipe rack system to include its value, cost, efficiency, among other things. According to the documents' file data, it was created by FORREST on April 29, 2019 and last edited by FORREST on May 5, 2019.

44.     The most basic point of the document was to convince the reader of the necessity for COPA to purchase the pipe racks from DB Oilfield, thus ultimately reducing long term labor costs associated with paying a contractor to conduct pipe inspections.   FORREST refers to "Eco Edge" throughout the document as the contractor designated to perform the pipe rack inspections (the labor). Eco Edge is Eco Edge Armoring, LLC, an Anchorage based company owned by FORREST's friend NATHAN KEAYS.  In a separate scheme to defraud, FORREST conspired with KEAYS to embezzle $3,027,270 and attempted to embezzle another $160,680 from COPA for fictitious material and labor costs for labor that was not performed and laborers who did not exist.   One specific labor cost that KEAYS invoiced COPA and was paid for was to perform pipe inspections at the Fairbanks Railroad Yard.

45.     In a November 15, 2019 interview of Michael Thomas, President and Chief Operating Officer of Tubular Solutions Alaska (TSA), it was learned that TSA had a work contract with COPA to perform the pipe inspections. That person, Roger Murray, had never heard of Eco Edge.

46.     FORREST wrote false information in the pipe rack promotional document, to include the following statements, "I spoke with the Alaska Rail Road Manager and Eco Edge Owner, both agreed that this new system/method would: A) increase productivity/efficiency, B) Make for a safer working environment for its employees. C) Ensure all COP OCTG stays together (no mixing with other operators) D) Reduce time Eco Edge would need to be at the RR (thus saving COP money)." The Alaska Railroad Manager referred to above was Michelle Renfrew. Renfrew spoke with Rick Bjorhus, COPA Senior Drilling Supervisor North Slope Rotary Operations, and told him she spoke with FORREST about the pipe racks but told him the opposite, that they would not be a good fit at the Alaska Railroad Yard.

47.     With respect to cost, FORREST wrote, "The quotes I received ranged from $2M – $1.2M. I spoke (e-mailed) further with the lowest bidder and they agreed to lower the bid to $990K for 22 racks (essentially because they want to get their foot in the door $45k/rack note this is FOB Fairbanks RR)." There is no evidence to suggest FORREST received quotes from any other vendor, because this particular design was created by Brad Frazier, the Research and Design Supervisor at Northern Solutions, LLC. Frazier told Jeff Laughlin, COPA's security director, that the pipe rack system was his concept, design, and that no units have ever been built. Frazier further advised FORREST had inquired about the pipe rack system under the guise that COPA would be interested in purchasing them. At that time, Frazier provided FORREST with a copy of the blue prints for the pipe rack system, and quoted FORREST $15,000 per pipe rack.

18

48.     In short, FORREST, under false pretenses, met with Frazier to acquire a copy of Northern Solutions' pipe rack design for the purpose of inputting the design into the above discussed promotional information and claiming that DB Oilfield – a company, in part set up by himself and his father-in-law BENEFIELD – had "the patent on this revolutionary design." When in reality, this design was that of Frazier's at Northern Solutions, has never been built and would never be built or delivered to COPA.

49.     On May 6, 2019, FORREST sent the following e-mail to Brent Overman, a COPA contractor working for ASRC Energy Services, "Can you please receipt for PO # 4521647051. Invoice attached and verified with Scott & Katrina at the Fairbanks RR that they are in fact there are ready for use. This is a small vendor so would like to make sure they get paid with-out any hick-ups. Can you please let me know when receipted?" This is an example of FORREST telling Overman to receipt for 22 pipe racks costing COPA $990,000, and using his position as a full-time COPA employee to instruct a contractor to do something (receipt for the purchase order) without verifying himself that the material was actually at the Fairbanks Railroad, and taking FORREST's word for it that "Scott & Katrina" verified the pipe racks were there and ready for use. In reality, the pipe racks were not at the Fairbanks Rail Road Yard, and Katrina had not worked at the Fairbanks Rail Road Yard for a couple of years.

50.     The same day, May 6, 2019, two purchase orders (4521647051 and 4521647299) were created and receipted. A third purchase order (4521653859) was created and receipted on May 8, 2019. All three purchase orders were for 22 pipe racks at $45,000 each, or $990,000 per purchase order, for a total liability of $2,970,000.

51.     An invoice purchase order (4521653859) was submitted to COPA on May 9, 2019. The invoices' file data indicated that it was last modified by FORREST's wife AMANDA.

52.     The final two (2) invoices for purchase orders (4521647051 and 4521647299) were submitted to COPA on May 13, 2019. Again, both invoices' file data indicated that they were last modified by FORREST's wife AMANDA.

53.     On June 16, 2019, two separate payments in the amounts of $990,000 each, for a total of $1,980,000 was deposited by EFT into the DB Oilfield AKUSA account ending in 5982 with the associated business address as the **TARGET RESIDENCE.**

54.     A week later on June 23, 2019, a third payment in the amount of $990,000 was deposited by EFT into the DB Oilfield AKUSA account ending in 5982 with the associated business address as the **TARGET RESIDENCE.**

*TUBING/CASING CRIBBING*

55.     On May 23, 2019, FORREST sent BENEFIELD an e-mail and copied George Wilcox, in which FORREST stated: "You mentioned you could get your hands on a bunch of used (usable) low temp high grade Dril-Tech cribbing/saddles that could save us a couple maybe few hundred thousand dollars. Can you please check to see if you can support our ERD program?" According to Rick Bjorhus in his November 1, 2019 interview, ERD stood for Extended Reach Drilling, which is a manner in which COPA could drill for oil at deep depths and at an angle, thus reducing the oil rig's surface foot print. Bjorhus described cribbing as plastic holders for pipe to keep the pipe from touching each other during the shipping process.

56.     BENEFIELD responded vie e-mail shortly thereafter to FORREST with the following:

20

"I can absolutely get you all the cribbing at almost half the cost.   Most operators throw it away, I don't think they realize you can reuse it 3-4 times before having to replace.   I can get the whole 'lot' covered for right at $462K (if you take it all).   This will cover your 3 ½", 4 ½", 5 ½" 9 7/8" and dunnage for the larger sizes.   If you were to purchase new direct from Dril-Tech the cost would have been around $750K.   I hope this is a good enough savings to help in your cause in keeping your costs down.   Please let me know if you would like me to proceed, I can have it all together including new nuts, bolts and rods in less than a week at the Fairbanks RR."

57.     That evening, FORREST sent an e-mail to Dan Kouf, a COPA contractor working for ASRC Energy Services.  In the e-mail to Kouf, FORREST asked him to create a PR (purchase request) to DB Oilfield for the cribbing from 4 ½" upwards and to charge the cribbing to seven (7) different accounts.  FORREST also included a short write-up for Kouf to pass onto "Bartlesville" (ConocoPhillips Company Department of Treasury) if necessary to justify the cribbing purchase from DB Oilfield, "Drill Tech provides Alaska durable high quality cribbing/wrap that we use on our tubing and liner.  It's built to be used in our extremely low temperature environments and durable enough to handle our tough haul roads. **This is a steal at this price and will be saving almost $300K.**"  (Emphasis Added).

58.     According to Rick Bjorhus in his November 1, 2019 interview, the cribbing that FORREST promoted and ultimately got COPA to purchase from DB Oilfield, was at an "exorbitant" price, and from understanding what the product was, Bjorhus knew from experience COPA would never spend that much on such a product.  Bjorhus further said most of the material used to separate pipe at the Alaska Rail Road were pieces of wood.

59.     Likewise, during Linda Barnett's interview on November 12, 2019, she advised she had worked with Arco then COPA since 1987, and during all of those years working in the accounting field, she had never seen cribbing purchased prior to this incident.

21

60.     On May 27, 2019, FORREST sent Kouf another e-mail in which he told Kouf to amend the purchase order to include 3 ½" cribbing as well, but not to worry about the price because BENEFIELD told him the 3 ½" cribbing was already included in the price of $462,000.

61.     On June 3, 2019 at 12:58 PM, AMANDA sent FORREST an e-mail regarding an earnest money deposit her and FORREST may put down on the purchase of 15 houses in Las Vegas, NV. This particular interaction corresponds with the money laundering section detailed below. However, specific comments made by AMANDA to FORREST buttress the fact that the cribbing scheme was carried out to benefit herself and FORREST, and possibly BENEFIELD: "Im not comfortable with the Ernest money being the full 1M. I thought we discussed the 50K as ernest??? The contract clearly says that if the buyer defaults or doesn't meet contract the seller is entitled to the full ernest money deposit (EMD). Which means that he would retain 1M instead of the 50K deposit. Hmmmm????" (sic)

62.     At 1:05 PM, FORREST responds to AMANDA with the following e-mail, "Yeah, that's what I've been nervous about....**If we get the PO for 450K today or tomorrow, I say we go with it.** If not let's procrastinate or if nothing else have them re-write it." (Emphasis Added)

63.     The PO (purchase order) FORREST referenced in his e-mail response to AMANDA pertained to purchase order 4521688167 for cribbing in the amount of $462,000. This conversation explicitly shows that FORREST and AMANDA were the beneficiaries of the scheme.

64.     At 5:46 PM on June 3, 2019, AMANDA finished the final modification for the invoice associated with purchase order 4521688167.

65.     At 7:31 PM on June 3, 2019, BENEFIELD sent the following e-mail from his dboilfieldss@gmail.com account to FORREST, "Please see attached invoice for PO4521688167

22

for the casing and tubing to be used for ERD. It's all staged and ready to go at the ARR-Fairbank (Michelle verified). Let me know if you have any questions."

66.     Based on the sequence of events in which AMANDA modified the invoice, yet it was sent from her father BENEFIELD's e-mail account, suggests that AMANDA, FORREST and her father BENEFIELD conspired to perpetuate the scheme that resulted in COPA paying DB Oilfield for material that did not exist.

67.     The next day, FORREST e-mailed Kouf regarding purchase order 4521688167, and stated the following, "When you get a moment, can you please receipt for this?  Invoice attached and **I spoke with Michelle as well.**  All is good."  (Emphasis Added)

68.     Shortly thereafter, FORREST sent BENEFIELD an e-mail, "Thanks David, appreciate the help and thinking outside the box, it saved us a good sum."  It is your affiant's belief based on training and experience that FORREST's comment about saving COPA "a good sum" of money was a way for FORREST to memorialize a COPA record that DB Oilfield saved COPA money, when in fact it was the opposite, DB Oilfield through BENEFIELD, along with FORREST and his wife AMANDA, embezzled the entirety of the money and provided no material whatsoever.

69.     On July 9, 2019, a payment in the amount of $462,000 was deposited by EFT/ACH into the DB Oilfield AKUSA account ending in 5982 with the associated business address as the **TARGET RESIDENCE.**

*PIPE RACKS FOR ERD/PIPE INSPECTION SHELTERS*

70.     On July 25, 2019, BENEFIELD sent the following e-mail to FORREST regarding a new scheme, "There is concern that with some of this larger diameter Pipe for ERD that it will get messed up on the boards on the ground.  Since building the adjustable racks we can easily

23

and cheaply put these together for you if you like. The cost would be $1450/each ((heavier steel). The request was for 60. Would you like us to proceed?" FORREST responded shortly thereafter with, "David, we are going to move forward with the racks, thank you. I'd like to know a little more about the tubing/casing structures you told me about. Can you please give a P&D and brief description?"

71.     BENEFIELD responded with the following:

> "The structures you are referring to are used communally in Canada due to weather so makes sense for AK as well. They are $75k/ each but the rewards surpass the initial cost. We can inspect the pipe in the coldest and worse of weather. For 8 of them which would NOT slow your down the cost would be 600k. But as you already know we guarantee our work 100%. These shelters shield people from the environments of the cold, wind and exhaustion. Pleases let me know if interested. Sept 1st we could have them all ready." (sic)

72.     Almost immediately after receiving BENEFIELD's response at 6:46 PM on July 25, 2019, FORREST forwarded the information to Charles Chapman and added the following e-mail message, "I really like the idea od these no only for cost efficiency but of course safety as well. Charles, Can you please create the req of these eight. Delivery September 1st. once again free (one -off's) free text is fine. Please split the charges against the ERD wells. SSJ-They are proven to deliver with no excuses. **We need reliability and DB has proven that time/to=time again**." (sic)(Emphasis Added)

73.     On July 26, 2019, BENEFIELD sent the following e-mail to Chapman and JoAnn Fellows in which he clarifies he would be putting together 80 pipe racks rather than 60 as previously discussed, at a cost of $1,450 each for a total of $116,000; and providing eight (8) pipe inspection shelters at a cost of $75,000 each for a total of $600,000.

74.     The cumulative amount for putting the pipe racks together and for providing the pipe inspection shelters came to $716,000 and were all accounted for on purchase order 4521770759.

75.     Later in the day on July 26, 2019, FORREST sent an e-mail to Fellows in which he seemingly created a sense of urgency for her to complete her job so DB Oilfield could submit an invoice and get paid, "Can you please move forward with this, this is for ERD and we can't afford delays. The rig alone is over 500K/day. As always any help appreciated!"

76.     On July 27, 2019, BENEFIELD sent an e-mail to FORREST with an embedded invoice for $716,000, for the construction of 80 pipe racks ($116,000) and eight (8) inspection shelters ($600,000). Also included with the e-mail was the following note from BENEFIELD, "Forrest, All work completed. Glad to help. Please let me know if there's anything I can help with!"

77.     Minutes later, FORREST forwarded BENEFIELD's e-mail to Charles Chapman and included the following message, "Scott at the RR said all is completed and ready for the winter season. Can you please have these receipted for? (I'm unable)."

78.     Two days later on July 29, 2019, a purchase order (No. 4521770759) to DB Oilfield for "PIPE RACKS FOR ERD" and "PIPE INSPECTION SHELTERS" was generated.

79.     Because the invoice was supposed to be submitted through Actian, an e-invoicing tool utilized by COPA, it is your affiant's belief that the invoice previously provided to FORREST on July 27, 2019 had to be resubmitted through Actian. This occurred on August 23, 2019. Records obtained from Actian confirmed that someone logged into the DB Oilfield Actian account at 3:22 PM on August 23, 2019. Actian captured the login IP Address as 206.174.46.52, which is assigned to General Communications, Inc. (GCI), an Anchorage based

25

telecommunications company that provides cellular telephone service, internet and cable television. Moreover, the last person to modify the submitted invoice at 2:02 PM on August 23, 2019, was AMANDA. Based on the totality of the circumstances, it is your affiant's reasonable belief that BENEFIELD did not submit this particular invoice to Actian, for a couple of reasons, 1) BENEFIELD resides in Oklahoma and GCI does not provide direct internet or cellular services there, and 2) the invoice was modified by AMANDA approximately 80 minutes before the invoice was submitted using a GCI IP Address.

80.     This invoice, in part, deals with the putting together of the pipe racks that were sold to COPA by DB Oilfield in June 2019 for a total of $2,997,000. As previously discussed, Bjorhus spoke with Michelle Renfrew, the Alaska Railroad manager, who specifically said she declined having the pipe racks at the Alaska Railroad Yard. Bjorhus codified his discussion with Renfrew in an October 9, 2019 e-mail to Jeff Laughlin, COPA Security:

> It was brought to my attention that we had purchased a large amount of pipe racks from DB Oilfield services and they were in use at the Fairbanks Alaska Railroad yard. **I inquired with Michelle Renfrew about the location of the pipe racks and she stated she had told Forrest that those pipe racks would not work for them and then she never heard anything back.** There is an email stating in SAP to Brent Overman to receipt for the racks from Forrest and that Scott and Katrina at the Fairbanks RR had confirmed they were there and ready for use. Michelle confirmed that Katrina has not worked for the RR for a couple of years now and that the racks are not there. (Emphasis Added)

81.     With respect to the inspection shelter portion of the invoice, Bjorhus conveyed to your affiant in a November 1, 2019 interview that he did not know what an inspection shelter was because they do not exist. Bjorhus understood the concept, that an inspection shelter could cover pipe to protect it from the elements. Bjorhus decidedly stated, "we don't do that in

Fairbanks." In Bjorhus's experience over the last 20-years, inspection shelters do not exist and are not feasible.

*MONEY LAUNDERING*

82.     On June 16, 2019, BENEFIELD received two (2) EFT/ACH deposits from COPA into his DB Oilfield's AKUSA account ending in 5982. The deposits, as discussed above pertained to non-existent pipe racks, and totaled $1,980,000.

83.     On June 17, 2019, a check (#46) was drawn on BENEFIELD's DB Oilfield AKUSA account ending in 5982 in the amount of $891,000.

84.     On June 17, 2019, a check in the amount of $891,000 was deposited into Spectrum Consulting Services's (SCS) AKUSA account ending in 0183. SCS was FORREST and AMANDA's consulting company.

85.     On June 19, 2019, a check (#47) was drawn on BENEFIELD's DB Oilfield AKUSA account ending in 5982 in the amount of $891,000. Also on June 19, 2019, a check (#1117) was drawn on KEAYS's Eco Edge AKUSA account ending in 7951 in the amount of $20,625. The combined checks from DB Oilfield and Eco Edge amounted to $911,625.

86.     On June 19, 2019, checks amounting to $911,625 were deposited into FORREST and AMANDA's SCS AKUSA account ending in 0183.

87.     On June 23, 2019, BENEFIELD received a third EFT/ACH deposit in the amount of $990,000 from COPA into his DB Oilfield AKUSA account ending in 5982. The deposit, also pertained to non-existent pipe racks.

88.     On June 25, 2019, a check (#48) was drawn on BENEFIELD's DB Oilfield AKUSA account ending in 5982 in the amount of $891,000.

89.     On June 25, 2019 a check in the amount of $891,000 was deposited into FORREST and AMANDA's SCS AKUSA account ending in 0183.

90.     On July 9, 2019 BENEFIELD received an EFT/ACH deposit in the amount of $462,000 from COPA into his DB Oilfield's AKUSA account ending in 5982. The deposit, as discussed above pertained to non-existent cribbing.

91.     On July 9, 2019, a check (#49) was drawn on BENEFIELD's DB Oilfield AKUSA account ending in 5982 in the amount of $415,800.

92.     On July 9, 2019, checks amounting to $538,625.50 were deposited into FORREST and AMANDA's SCS AKUSA account ending in 0183.

93.     BENEFIELD withdrew cash on several occasions from DB Oilfield's AKUSA Account ending in 5982. Some of these cash withdrawals were conducted at Armstrong Bank and the Muscogee Creek Casino.

94.     On July 23, 2019, FORREST and AMANDA organized Wright Capital Investments, LLC in Nevada.

95.     On August 12, 2019, FORREST and AMANDA utilized their SCS AKUSA account ending in 0183 to wire $2,893,341.97. This wire was presumably sent to Fidelity National Title Agency of Nevada, Inc., to complete the purchase of "15 separate residential properties," in Las Vegas, NV. On November 24, 2019 your affiant searched the Clark County Assessor's website by inputting "Wright Capital Investments, LLC" and learned that Wright Capital Investments, LLC owns the following properties:

        a.  6233 Espinosa Avenue, Las Vegas, NV

        b.  5908 W. Bartlett Avenue, Las Vegas, NV

        c.  1524 Saylor Way, Las Vegas, NV

d.  1400 Saylor Way, Las Vegas, NV

e.  5824 Iris Avenue, Las Vegas, NV

f.  5821 Halifax Avenue, Las Vegas, NV

g.  716 Vincent Way, Las Vegas, NV

h.  609 Cline Street, Las Vegas, NV

i.  501 Slayton Drive, Las Vegas, NV

j.  4609 Sawyer Avenue, Las Vegas, NV

k.  721 Fairway Drive, Las Vegas, NV

l.  1826 Green Acres Avenue, Las Vegas, NV

m.  5201 Mountain View Drive, Las Vegas, NV

n.  3973 Arrowood Drive, Spring Valley, NV

96.     On August 12, 2019 FORREST and AMANDA utilized their SCS AKUSA

account ending in 0183 to wire $212,512.01.  This wire was presumably sent to Fidelity National

Title Agency of Nevada, Inc., to complete the purchase of "3602 Gold Sluice Avenue, North Las

Vegas, NV."  On November 24, 2019, your affiant reviewed the Clark County Assessor's

website and learned that Wright Capital Investments, LLC owns 3602 Gold Sluice Avenue,

North Las Vegas, NV.

97.     On August 12, 2019 FORREST and AMANDA utilized their SCS AKUSA

account ending in 0183 to wire $111,066.76.  This wire was presumably sent to Fidelity National

Title Agency of Nevada, Inc., to complete the purchase of "2149 Sleepy Court, Las Vegas, NV."

On November 24, 2019, your affiant reviewed the Clark County Assessor's website and learned

that Wright Capital Investments, LLC owns 2149 Sleepy Court, Las Vegas, NV.

98. On September 25, 2019 BENEFIELD received an EFT/ACH deposit in the amount of $716,000 from COPA into his DB Oilfield's AKUSA account ending in 5982. The deposit, as discussed above pertained to non-existent inspection shelters and the construction of the non-existent pipe racks.

99. On September 27, 2019, a check (#52) was drawn on BENEFIELD's DB Oilfield AKUSA account ending in 5982 in the amount of $644,400.

100. On September 27, 2019, a check in the amount of $644,400 was deposited into FORREST and AMANDA's SCS AKUSA account ending in 0183.

## COMPUTER-RELATED DEFINITIONS

101. The following definitions apply to this Affidavit and Attachment B:

a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

c. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices

30

(including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      d.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      e.      "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

      f.      "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

31

g.      A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications.   For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services. See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

h.      "Electronic Storage Device" includes, but is not limited to, external and internal hard drives, thumb drives, flash drives, SD cards, gaming devices with storage capability, storage discs (CDs and DVDs), cameras, cellular phones, smart phones and phones with photo-taking and/or internet access capabilities, and any "cloud" storage by any provider.

i.      "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet.  FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

j.      "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

k.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

32

l.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

n.      "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones.  SMS is also often referred to as texting, sending text messages or text messaging.  The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.  The term "computer," as defined in 18 U.S.C. § 1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

## SPECIFICS ON SEARCH AND SEIZURE OF COMPUTERS

102.    I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience and information related to me by agents and others involved in the forensic examination of cell phones, I know that data can be stored on a variety of systems and storage devices.  I also know that during the search of the premises it is not always possible to search cell phones for data for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and

33

specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted; and

c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

## LIMIT ON SCOPE OF SEARCH

103.    I submit that if during the search, agents find evidence, fruits, and/or instrumentalities of crimes not set forth in this affidavit, another agent or I will seek a separate warrant.

## REQUEST FOR SEALING OF MATTER

104.    I request that the Court order sealing this case until further order of the Court. The documents filed in the case discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to destroy or

tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

## CONCLUSION

105.    As noted above, this affidavit is made in support of an application for a warrant to search **BENEFIELD's** residence located at **15030 East 23rd Street South, Webbers Falls, Oklahoma**, more particularly described in Attachment A, and to seize the items set forth in Attachment B.  As detailed herein, I respectfully submit that there is probable cause to believe that **BENEFIELD**, a resident of **15030 East 23rd Street South, Webbers Falls, Oklahoma, 74470** maintains evidence, fruits, and instrumentalities of 18 U.S.C. § 1343 – Wire Fraud, 18 U.S.C. § 1956 – Laundering of Monetary Instruments, 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, and 18 U.S.C. § 371 – Conspiracy to commit Wire Fraud (*i.e.*, the **SUBJECT OFFENSES**), further detailed in Attachment B, in his residence located at **15030 East 23rd Street South, Webbers Falls, Oklahoma, 74470.**

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Timothy James Deppner, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this ___ day of December, 2019.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE

35

## ATTACHMENT A

### Property to Be Searched

A one-story modular home with a brown roof, white front door, and two white single car garage doors, located at **15030 East 23rd Street South, Webbers Falls, Oklahoma**, **74470**, which is the residence of **DAVID WAYNE BENEFIELD** (hereinafter the "**SUBJECT PROPERTY**"). Search location pictured below:



**ATTACHMENT B**

**Particular Things to be Searched for and Seized**

The following are the items to be searched for and seized from the **SUBJECT PROPERTY (15030 East 23rd Street South, Webbers Falls, Oklahoma, 74470)** more fully described in Attachment A, which is hereby incorporated by reference herein, are those items that constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1343 – Wire Fraud, 18 U.S.C. § 1956 – Laundering of Monetary Instruments, 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity and 18 U.S.C. § 371 – Conspiracy to commit Wire Fraud (*i.e.*, the **SUBJECT OFFENSES**), from January 1, 2019 to present, specifically:

1. All records, however kept, relating to the **SUBJECT OFFENSES,** those violations involving **DAVID WAYNE BENEFIELD, AMANDA WRIGHT, NATHAN KEAYS** and **FORREST WRIGHT**, and occurring on or after January 1, 2019 until current;

   a. Contracts, purchase orders, invoices, receipts or any other business documents related to work allegedly performed or supplied to ConocoPhillips Company – Alaska (COPA);

   b. Communications of any kind between **BENEFIELD** and **FORREST, AMANDA and/or KEAYS**, and any COPA or COP representatives concerning any contract, purchase order, invoice, receipt or any other acquisition and payment issue or scheme related to work allegedly performed or supplied to COPA.

   c. Any communications or records of any kind regarding **BENEFIELD's** travel history;

   d. Bank and/or Financial records to include, bank account statements, credit card statements, account holder information, banking deposit slips and withdrawal slips, handwritten notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to

37

include routing codes, deposit receipts, canceled checks, loan agreements and loan applications; wire transfer information; checks, check registers and other bank and credit card documents; bonds purchases and sales; precious metals purchases; other commodity purchases and sales; and cryptocurrency purchase, sale and/or transfer records.

e. Records and information related to the following email account, which is or has been associated with **BENEFIELD:** dboilfieldss@gmail.com

f. Records and information associated with the following telephone number, which is or has been associated with **BENEFIELD**: 907-251-1217

g. Records and information associated with the creation and maintenance of the following website: www.dboilfieldsupportservices.com

h. Records and information related to fruits of, or the expenditure of proceeds related to, the **SUBJECT OFFENSES**, namely, receipts, purchase agreements/proofs of purchase, vehicle titles, warranty applications, photographs and/or video recordings of items of property (e.g., vehicles, jewelry, bicycles), travel itineraries, passports including visas, airline tickets, airline ticket receipts, pre-printed airline luggage tags, handwritten notes containing airline confirmation codes, frequent flyer mileage plan cards and summaries, hotel receipts, car rental agreements and receipts, which constituted evidence of the **SUBJECT OFFENSES**;

i. Records and information related to wire transfer documents, receipts and handwritten notes containing wire service tracking numbers, amounts sent and intended pay-out locations.

j. Any and all documents related to the following companies, individuals and/or entities: Wright Capital Investments, LLC; Spectrum Consulting Services; Eco Edge Armoring, LLC; The Friendly Geek; Peter Broady; Orange Realty Group; HostGator; Fidelity National Financial, Inc.; Armstrong Bank; Muscogee Creek Casino; and the Alaska Department of Commerce.

2. Any and all currency exceeding $2,000 USD dollars. The form of that currency shall include, but not be limited to: cash in any denomination, gold bullion and/or other precious metals, bearer bonds, stocks, money orders, certificates of deposit and cashier's checks, and digital cryptocurrencies (*i.e.* Bitcoin, Litecoin, Ethereum, etc.), however maintained (i.e. on digital currency exchanges such as Binance, Coinbase, Bittrex, etc., on devices known as cold storage devices, such as the Ledger Nano S or the Trezor Hardware Wallet, or on online storage wallets such as My Ethereum Wallet, Bitcoin Wallet, etc.), and/or foreign currency.

3. Safe deposit box keys and agreements and commercial storage locker keys or

records controlled by **BENEFIELD.**

4.  Records and information regarding control of the **SUBJECT PROPERTY** from January 1, 2019 to present, including utility company receipts/bills, mortgage or rent receipts, canceled mail, envelopes, keys, telephone bills, charge card receipts/statements, lease-rental or sale agreements or contracts, receipts, photographs, videos, vehicle registrations and titles, land titles, escrow papers, and legal documents;

5.  Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of computer equipment found in the search location and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

6.  Computers or storage media, including wireless or mobile phones, tablets, and USB flash storage devices capable of containing any documents, receipts, correspondence, communications, images/media of the records, information, and items described in paragraphs 1-5 above, and/or used to commit the **SUBJECT OFFENSES.**

7.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"), each such COMPUTER may be searched, for the period of January 1, 2019 to present, for records, information, and items detailed in paragraphs 1-7 of this Attachment, as well as the following:

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of computer access, use, and events relating to the SUBJECT OFFENSES and to the COMPUTER user;

e.   evidence indicating the COMPUTER user's state of mind as it relates to the SUBJECT OFFENSES;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

n.   Evidence of the times the COMPUTER was used;

o.   Evidence of who used, owned, or controlled the COMPUTER during its use;

p.   Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

8.   Mobile communication devices: Cellular telephones and other communications devices including flip phones, Blackberries, iPhones, and other cellular phones may be seized, and searched for items 1-8 in this Attachment as well as the following:
   a.   Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

     b.  Stored list of recent received calls;

     c.  Stored list of recent sent calls;

     d.  Stored contact information;

     e.  Stored geolocation information;

     f.  Stored photographs of items suspected to be paid for with proceeds of the SUBJECT OFFENSES; and,

     g.  Stored text messages.

9.    Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.

10.    The above identified information and/or data may be stored electronically.  In searching for electronically stored evidence, as further detailed in the Affidavit, law enforcement personnel executing this search warrant will employ the following procedure: the computer forensic examiner will attempt to create an electronic image of all computers that are likely to store files pertaining to or relevant to the crimes outlined in the affidavit.  The computer forensic examiner or another technical expert will then conduct an off-site search for evidence of those offenses.

11.    If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer or computer system that the computer forensic examiner believes must be seized to permit the agents to locate the relevant evidence at an off-site location.  The components will be seized and taken into custody of the agent.  If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.